IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**DR. TAMAR GOULET**                                                                 **PLAINTIFF**

**v.**                                          **CIVIL ACTION NO.** 3:22cv89-NBB-JMV

**THE UNIVERSITY OF MISSISSIPPI**                                    **DEFENDANT**

**COMPLAINT**
**JURY TRIAL DEMANDED**

**COMES NOW** the Plaintiff, Dr. Tamar Goulet, by and through counsel, Watson & Norris, PLLC, and files this action to recover damages for violations of her rights and retaliation pursuant to the Civil Rights Act of 1964 (Title VII) Sex Discrimination, and the Equal Pay Act (EPA). In support of this cause, the Plaintiff would show unto the Court the following facts to-wit:

**THE PARTIES**

1. Plaintiff, Dr. Tamar Goulet, is an adult female resident of Oxford, Mississippi.

2. Defendant, The University of Mississippi, may be served with process by serving Lynn Fitch, Attorney General, at 550 High Street, Jackson, Mississippi 39201.

**JURISDICTION AND VENUE**

3. This Court has federal question jurisdiction and venue is proper in this Court.

4. Plaintiff timely filed a Charge of Discrimination with the EEOC on June 8, 2021, a true and correct copy of which is attached as Exhibit "A." The EEOC issued a Right to Sue on February 22, 2022, a true and correct copy of which is attached as

Exhibit "B."

5. Plaintiff timely files this cause of action within the appropriate statute of limitations for claims arising under Title VII, and the EPA.

## STATEMENT OF FACTS

6. Plaintiff is a 56-year-old female resident of Oxford, Mississippi.

7. Plaintiff was hired on January 1, 2001, as an Assistant Professor at the University of Mississippi (UM).

8. In 2008, Plaintiff was promoted to the position of Associate Professor and granted tenure.

9. By 2015, Plaintiff was promoted to the position of a tenured Full Professor.

10. Because of her meritorious achievements and because she achieved the necessary prerequisites, Plaintiff was granted promotion to Full Professor in the minimum amount of time.

11. In 2021-22, there were 21 Tenured or Tenure track faculty in the Department of Biology, which included eight Full Professors.

12. Plaintiff was the only female Full Professor in that department.

13. Plaintiff is also one of only four female Full Professors (5.41%) out of the 74 Tenured or Tenure track faculty in the four Science and Math departments in the College of Liberal Arts.

14. Faculty in the sciences are generally evaluated in three main areas: their achievements in research, teaching, and commitment/service.

15. Plaintiff has excelled in all three aspects of her job.

16. Plaintiff has conducted scientific research, funding her research through multiple grants.

17. As a Principal Investigator (PI) or co-PI, Plaintiff successfully obtained highly competitive grants, such as seven grants from the National Science Foundation (NSF).

18. These grants included receiving the coveted early career grant, the CAREER award.

19. Plaintiff was the first faculty member in the Department of Biology to receive a CAREER grant in over 20 years.

20. Plaintiff received a NSF Early Concept Grants for Exploratory Research (EAGER) grant.

21. Plaintiff's ability to secure external research funding has thus far brought $1,626,367 in grant money directly to UM, and $2,336,953 in total grant amounts as PI or co-PI.

22. Plaintiff has brought to UM large grants (called overhead funds) from government agencies, such as NSF.

23. So far, she has brought $740,539 in overhead funds to UM.

24. Plaintiff is currently a PI and a co-PI on two NSF grants and a PI on a grant from the Alan Alda Center for Communicating Science, women in STEM [Science, Technology, Engineering, and Mathematics] leadership program.

25. The gold standard for determining faculty productivity and the merit of their research, is publishing in peer-reviewed scientific journals and publishing peer-reviewed scientific chapters in peer-reviewed books.

26. Plaintiff consistently publishes her research in peer-reviewed scientific journals and books.

27. Since the Department of Biology has a broad range of disciplines, publication rates vary between research fields, but Plaintiff's publication rate is one of the highest in the Department of Biology.

28. This is especially noteworthy since many of Plaintiff's ecological research projects require multiple field seasons (and years) to complete.

29. Plaintiff is a worldwide expert in her research field.

30. In recognition of Plaintiff's expertise and her contributions to the advancement of science, in 2020, Plaintiff was selected as an International Coral Research Society Fellow, one of only six scientists worldwide chosen for the honor that year.

31. Since Plaintiff is a highly meritorious scientist, she was selected as one of only 125 women chosen nationally by the American Association for the Advancement of Science (AAAS) as IF/THEN Ambassadors.

32. As an IF/THEN Ambassador, Plaintiff is the only UM faculty, let alone a person from the state of Mississippi, that can claim the honor of having a full-size statue of herself that was displayed in Dallas, TX and then in our Nation's capital, in the esteemed Smithsonian Institution, as part of an historical women in STEM statue exhibit drawing world-wide attention.

33. Plaintiff is the only UM faculty, let alone a person from the state of Mississippi, that was featured in an episode of a national science show, Mission Unstoppable, on CBS.

34. Plaintiff also excels in teaching.

35. In addition to science research, Plaintiff publishes pedagogical papers.

36. Plaintiff is part of a national group of academics that are funded by NSF to transform science learning in general education life science courses.

37. UM has recognized Plaintiff's teaching innovations and commitment to teaching by awarding her the University of Mississippi College of Liberal Arts Cora Lee Graham Award for Outstanding Teaching of Freshmen in 2008, an Honorable Mention PLATO (Personalized Learning and Adaptive Teaching Opportunities) Program Teaching Excellence Award in 2018, and nominations for additional teaching awards three years in a row (2018-2020).

38. In July 2016, Gregg Roman was hired as the new Chair of the Biology Department.

39. Plaintiff contends that in 2018, Dr. Roman discriminated against her by giving 18 out of 19 of her Tenured or Tenure Track colleagues higher raises than her even though they were less meritorious, i.e., had lesser academic achievements.

40. That year, Dr. Roman gave Plaintiff the second lowest raise compared to her colleagues across all professorial ranks, i.e., her pay raise was 1.3%, which was less than the raise pool of 2% at that time.

41. Moreover, Dr. Roman made no effort to utilize gender equity funds to address the discrepancy between Plaintiff's salary and those of her male counterparts.

42. At that same time, Dr. Roman gave three male faculty (Associate Professor Ryan Garrick, Associate Professor Patrick Curtis, and Assistant Professor Eric Hom) raises well above the raise pool (4.12%, 4.34%, and 6.37%, respectively).

43. None of these counterparts had academic achievements that exceeded those of Plaintiff.

44. Dr. Roman also gave a Full Professor, Dr. Colin Jackson, a 3% raise.

45. Dr. Jackson, Dr. Garrick, and Dr. Curtis were promoted in 2018 – Dr. Jackson from Associate to Full Professor and Drs. Garrick and Curtis from Assistant to Associate Professor.

46. Even though all three male faculty received the lump sum associated with promotion ($5,500 and $8,500 for promotion to Associate and Full Professor, respectively) Dr. Roman's raises ensured that these three male faculty, in their new ranks, were earning salaries closer to their male peers (e.g., Dr. Garrick earning $334 more and Dr. Curtis earning $1,872 less than another Associate Professor, and Dr. Jackson earning $2,170 less than another Full Professor), Dr. Hom's large raise positioned him to earn only $297 less than his male peers when he was promoted to Associate Professor two years later, during a year when no merit raises were given.

47. Thus, even though UM set aside funds to specifically address gender inequity, Dr. Roman allocated raise funds to preferentially increase the salaries of male faculty to lessen raise gaps between male faculty, irrespective of merit variations.

48. For example, Drs. Jackson, Curtis and Hom published only one peer-reviewed publication compared to Plaintiff, who published three peer-reviewed publications that evaluation year.

49. Additionally, none of these male counterparts received any grant funding during the evaluation year, whereas Plaintiff received the prestigious NSF EAGER award.

50. On or around July 10, 2018, Plaintiff complained of Dr. Roman's actions as constituting sex discrimination and pay inequity to Dean Cohen, yet nothing was done.

51. On August 1, 2018, Plaintiff then took her complaints to Provost Noel Wilkin.

52. Provost Wilkin, however, refused to address the situation and told Plaintiff that salaries were not grievable.

53. On August 26, 2020, along with five other female faculty (three of whom were tenured or tenure track faculty and two instructors, the six of them comprising 50% of the female faculty in the Biology Department), Plaintiff met with Dean Lee Cohen.

54. Following that meeting, Plaintiff and the other female faculty collectively wrote a letter to Dean Cohen to summarize what the meeting had addressed.

55. The letter outlined the six female faculty members' collective complaints against Dr. Roman for various improprieties including but not limited to: "inappropriate physical contact" and "predatory complimenting of female faculty" with the intention of manipulating or even intimidating those complimented.

56. The letter notes how in one example "Dr. Roman moved uncomfortably close to [one of the six female faculty] in the main department hallway in order to insistently compliment that person's hair.

57. The faculty member maneuvered down the hallway in an attempt to escape, but Dr. Roman pursued her as she slid with her back against the wall."

58. The letter further states that Dr. Roman "employs such uninvited physical compliments before making professional requests of female faculty."

59. The letter further states that Dr. Roman "touches woman without their consent. He has stroked the arm of a female faculty member and another time attempted to stroke her neck and chin."

60. In summary, the letter is a complaint by the six female faculty members against Dr. Roman's highly inappropriate and manipulative behavior toward female faculty members.

61. On June 8, 2021, Plaintiff filed an EEOC Charge of sex discrimination, sex harassment, retaliation, and a violation of the Equal Pay Act.

62. On October 22, 2021, UM responded to Plaintiff's EEOC Charge of Discrimination with a Position Statement.

64. UM's Position Statement argues that Dr. Roman is paid more than Plaintiff because he was an external hire, unlike Plaintiff, who ascended through the ranks at UM.

65. Plaintiff contends, however, that external hires are paid the same salary as faculty that have risen through the ranks.

66. For example, UM paid Dr. Gregory Tschumper, the Chair of the Department of Chemistry and Biochemistry, the exact same 12-month salary as Dr. Roman, despite Dr. Tschumper climbing through the ranks at UM from Assistant to Full Professor.

67. Dr. Tschumper and Plaintiff joined UM as Assistant Professors in 2001, in January and July, respectively.

68. In 2010, Plaintiff was earning only $395 less than Dr. Tschumper, when both were Associate Professors.

69. In the years that followed, despite Plaintiff's strong performance in research and teaching, Dr. Tschumper received higher percentage raises than Plaintiff.

70. For example, in 2013, UM gave Dr. Tschumper a raise above the salary pool (e.g., he received a 7.43% raise = $7,207 when the salary pool was 3%; by contrast, Plaintiff received a 3% raise).

71. In an email from Dean Cohen to Plaintiff on May 18, 2022, Dr. Cohen stated that raises fall around the allotted salary pool, with slight raise increases above the salary pool due to merit.

72. Despite Plaintiff's strong history of merit, however, her raise increases have often been at the allotted salary pool (and below it during the year that Dr. Roman assigned raises).

73. When Plaintiff's salary was above the salary pool, it was only minimally so (i.e., 3.2% when the salary pool was 3% in 2021-22).

74. By contrast, Dr. Tschumper has received multiple raises well above the salary pool, as indicated above, i.e., a 7.43% raise when the pool was 3% in 2013.

75. Consequently, by 2016, when both Drs. Tschumper and Plaintiff had become Full Professors, Plaintiff's salary was $95,004 and Dr. Tschumper's salary was $105,274, a discrepancy of $10,270.

76. Plaintiff and Dr. Tschumper are both highly meritorious scientists.

77. Even though no two scientists are identical, Plaintiff and Dr. Tschumper are similarly situated.

78. Both have brought to UM multiple research awards and funding, although Plaintiff received the prestigious NSF CAREER award while Dr. Tschumper did not.

79. Both received a UM teaching award.

80. Both Plaintiff and Dr. Tschumper have been recognized by their respective research societies for their scientific achievements.

81. Although Dr. Tschumper was in the Department of Chemistry/Biochemistry, the salary that UM paid him in 2016 was comparable with salaries of male Full Professors in the Department of Biology (i.e., Plaintiff's Department) at that time, e.g., $113,094; $106,194; $105,791; $119,252), thereby demonstrating how Plaintiff's salary lagged in comparison to her male counterparts within her own department.

82. Dr. Tschumper's salary has continued to increase such that in the 2021-22 schoolyear he is earning a salary, which when pro-rated for nine months, was $120,150, compared to Plaintiff's salary of $99,386.

83. In a similar situation, in 2007, six years after Plaintiff joined UM as an Assistant Professor, and while she was in the process of being successfully admitted for tenure and promotion, Dr. Nathan Hammer, joined the Department of Chemistry and Biochemistry as an Assistant Professor.

84. Over the years that followed, UM gave Dr. Hammer raises multiple times the allotted salary pool, e.g., 2013 (15.59% raise = $10,249, salary pool 3%).

85. As a result of UM's preferential treatment of male faculty in the sciences, when Dr. Hammer was promoted to Full Professor in 2019, UM paid him $100,245 compared to Plaintiff's 2019 salary of $96,304 (i.e., a discrepancy of $3,941).

86. Plaintiff and Dr. Hammer are both highly meritorious scientists.

87. Even though no two scientists are identical, Plaintiff and Dr. Hammer are similarly situated.

88. Both have brought to UM multiple research awards and funding, with both Plaintiff and Hammer receiving the prestigious NSF CAREER.

89. Both received teaching awards.

90. Both Plaintiff and Dr. Hammer received honors for their scientific contributions.

91. When Plaintiff was promoted to Full Professor in 2015, UM paid her $94,294, which was $5,951 less than what UM paid Dr. Hammer when he was promoted to Full Professor in 2019.

92. In the fiscal year 2021-22, although the raise pool was 3%, UM gave Dr. Hammer a 4.75% raise to his salary, which was already higher than Plaintiff's salary by that point.

93. By comparison, Plaintiff was given a raise of 3.2%, allegedly rewarding her merit with an increase above the raise pool of 0.2%.

94. Drs. Hammer and Dr. Tschumper are not exceptions.

95. Dr. Jared Delcamp joined the Department of Chemistry and Biochemistry in 2013.

96. UM gave him raises of 3.9% (salary pool 1%), 4.17% (salary pool 0%), 4.0% (salary pool 2%), and 5.39% (salary pool 0%) in 2016, 2017, 2018, and 2020, respectively.

97. After Plaintiff and her five female faculty peers filed their complaint in August 2020, following an investigation into Dr. Roman, which resulted in UM admitting that Dr. Roman repeatedly displayed "lapses in situational judgement and awareness" against

11

multiple female faculty members, Dr. Roman is no longer Chair of the Department of Biology.

98. In January 2021, Dr. Roman was moved out of the College of Liberal Arts into the School of Pharmacy.

99. Dr. Roman is now a regular Full Professor, a similarly situated male employee to Plaintiff.

100. Plaintiff contends that for the 2021-22 year, she was paid a 9-month salary of $99,386, whereas similarly situated male Full Professor, Dr. Roman, was paid $118,429.

101. Dr. Roman is actually paid a 12-month salary of $157,894, yet if this amount is pro-rated to nine months, his salary is $19,043 more than Plaintiff's salary.

102. Since joining UM in 2016, Dr. Roman has published only six peer-reviewed publications compared to the 15 publications that Plaintiff has published in the same amount of time.

103. Since joining UM, Dr. Roman has been unsuccessful in obtaining funds for his scientific research while Plaintiff garnered a prestigious NSF EAGER grant for $319,772.

104. Dr. Roman is part of an institutional UM equipment grant, for which his part is $1,000,000.

105. Comparably, during the same time period, Plaintiff has obtained two NSF grants ($319,772 and $836,111) in addition to a $10,000 from the American Association for the Advancement of Science and a $3,000 grant from the Alan Alda Center for Communicating Science.

106. In total, Plaintiff has obtained $1,168,883 in external research funds.

107. Despite Dr. Roman not having any administrative responsibilities in 2021-22, Dr. Roman's salary, when pro-rated for 9-months, was $19,043 more than Plaintiff's was.

108. Furthermore, when Dr. Roman was Chair of the Department of Biology in 2020, even if one deducted the administrative supplement he received, his pro-rated 9-month salary was still $19,060 more than Plaintiff's salary, i.e., and equivalent to Dr. Tschumper's who worked up through the ranks at UM.

109. UM's Position Statement alleges that faculty from schools and departments other than the Biology Department are not appropriate comparators for Plaintiff.

110. Plaintiff asserts, however, that she is an employee of UM.

111. Plaintiff's contract is not with the Department of Biology, but rather with UM.

112. Plaintiff's salary and raises are approved as a university employee, and UM is responsible for ensuring equity among faculty.

113. The Department of Biology is part of UM, not a stand-alone entity.

114. As such, salaries in the Department of Biology are not isolated nor independent from other comparable departments in the sciences across the university.

115. Moreover, Plaintiff further asserts that while the Chairs of each department make the decisions regarding percentage raises and eligibility for equity raises, it is the responsibility of the Dean to oversee the actions of her/his Chairs of all departments and to ensure that raises are being distributed in a fair and equivalent manner.

116. It is also the responsibility of the Provost, who is also the Executive Vice Chancellor for Academic Affairs, to ensure that faculty are treated fairly across UM, including with respect to raises.

117. The equity study conducted in 2019, that was referenced by UM's Position Statement, declared a stated purpose of ensuring equity of pay, including gender-based pay inequities.

118. The study compared the salaries of not only female faculty in all 21 different departments in the College of Liberal Arts but also the School of Journalism.

119. Plaintiff contends that the study is flawed because in some cases it compared the salaries of faculty that are typically not equivalent.

120. For example, salaries of faculty in the humanities (e.g., Departments of Classics and History) and arts (e.g., Departments of Music and Theatre and Film) are typically lower than the salaries of faculty in the sciences.

121. Plaintiff contends that faculty in these humanities and arts departments are not appropriate comparators to herself.

122. Moreover, this is one of the reasons for her argument that the 2019 study is flawed.

123. However, Plaintiff contends the salaries of faculty within sciences and between the sciences and the schools of Engineering and Pharmacy are equivalent and may be reasonably considered as comparators.

124. Finally, it is noteworthy that salaries for the same job at the same rank have increased over the years.

125. For example, UM hired Plaintiff as an Assistant Professor in 2001 and started her at $41,000.

126. In 2019, the starting salary of an Assistant Professor in the Department of Biology was $71,000.

127. Given that Plaintiff's current salary as a tenured Full Professor is $99,386, it is noteworthy that she is making only $28,386 more than an Assistant Professor just starting out, and it strongly points to the lack of gender-equity compensation applied to her salary.

128. Defendant has retaliated against Plaintiff for reporting the conduct of her boss Dr. Gregg Roman.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF TITLE VII – SEX DISCRIMINATION

129. Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 128 above as if fully incorporated herein.

130. Defendant's actions constitute intentional discrimination on the basis of her sex, female, which is prohibited by the Civil Rights Act of 1964 (Title VII).

131. Plaintiff has been harmed as a result of this discrimination, and the Defendant is liable to Plaintiff for the same.

132. The acts of the Defendant constitute a willful intentional violation of Title VII and entitle Plaintiff to the recovery of damages as set forth by Title VII and 42 U.S.C. §1981a.

## COUNT II: VIOLATION OF TITLE VII – RETALIATION

133. Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 132 above as if fully incorporated herein.

134. Defendant's actions constitute retaliation which is prohibited by the Civil Rights Act of 1964 (Title VII).

135. Plaintiff has been harmed as a result of this retaliation, and the Defendant is liable to Plaintiff for the same.

136. The acts of the Defendant constitute a willful intentional violation of Title VII and entitle Plaintiff to the recovery of damages as set forth by Title VII and 42 U.S.C. §1981a.

## COUNT III: VIOLATION OF THE FEDERAL EQUAL PAY ACT (EPA)

137. Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 136 above as if fully incorporated herein.

138. The EPA prohibits payment of unequal wages "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C § 206(d)(i).

139. Based on the facts alleged herein, Defendant is liable to Plaintiff for violating the EPA.

140. In violating the EPA, Defendant acted willfully and with reckless disregard of the EPA, and its actions were neither in good faith nor based upon reasonable grounds that it was not violating federal law.

141. As a result of Defendant's discriminatory conduct, Plaintiff has suffered serious damages, including, *inter alia,* mental anguish and other emotional pain and suffering, and general and special damages for lost compensation and job benefits.

### COUNT IV: VIOLATION OF THE FEDERAL EQUAL PAY ACT (EPA) – RETALIATION

142. Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 141 above as if fully incorporated herein.

143. The EPA prohibits payment of unequal wages "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C § 206(d)(i).

144. Based on the facts alleged herein, Defendant is liable to Plaintiff for violating the EPA and for retaliating against her after she complained of unequal pay.

145. In violating the EPA, Defendant acted willfully and with reckless disregard of the EPA, and its actions were neither in good faith nor based upon reasonable grounds that it was not violating federal law.

146. As a result of Defendant's retaliatory conduct, Plaintiff has suffered serious damages, including, *inter alia,* mental anguish and other emotional pain and suffering, and general and special damages for lost compensation and job benefits.

### PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff respectfully prays that upon hearing of this matter by a jury, the Plaintiff be granted the following relief in an amount to be determined by the jury:

1. Back wages;
2. Increase in pay;

3. Compensatory damages;
4. Attorney's fees;
5. Costs and expenses;
6. Any other relief available pursuant to Title VII and/or the EPA; and
7. Such further relief as is deemed just and proper.

THIS, the 23rd day of May 2022.

                Respectfully submitted,

                DR. TAMAR GOULET, PLAINTIFF

By:  /s/Louis H. Watson, Jr.
      Louis H. Watson, Jr. (MB# 9053)
      Nick Norris (MB# 101574)
      Attorneys for Plaintiff

OF COUNSEL:

WATSON & NORRIS, PLLC
4209 Lakeland Drive # 365
Flowood, MS 39232-9212
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
Email: louis@watsonnorris.com
Web: www.watsonnorris.com